# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KATHRYN L. KILGAS,

    Plaintiff,

v.                                                                                           Case No. 06-C-0991

KIMBERLY-CLARK CORPORATION,

    Defendant.

## DECISION AND ORDER

Plaintiff Kathryn Kilgas sued her former employer, Kimberly-Clark Corporation ("K-C"), claiming that K-C discriminated and retaliated against her in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 216-17. Kilgas was 46 years old when K-C terminated her employment. She alleges that K-C favored younger employees in its personnel decisions and retaliated against her when she questioned this practice. K-C has now moved for summary judgment. For the reasons stated herein, the motion for summary judgment will be granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that

it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

## FACTS[1]

K-C is a world-wide manufacturer of consumer goods, including products such as Huggies diapers, Kleenex tissue, and Scott towels. (Def. PFOF ¶ 4.) Kilgas began working directly for K-C as a marketing research assistant in December 1998, after previously working for the company as an employee of a staffing company. On October 8, 1999, Kilgas was promoted to the position of Consumer Logistics Analyst 1 (CLA-1). (Def. PFOF ¶ 12; P. PFOF ¶ 2.) Then, in early September 2004, she was transferred onto the "Mass Merchandising team." (Def. PFOF ¶ 18.) Kilgas took the place of Cheryl Young, another CLA-1, who was transferred off the Mass Merchandising team due to K-C's concerns with her performance. (Def. PFOF ¶ 22.) The Mass Merchandising team, a part of the customer service department, provided inventory and order management services for three

---

[1] "Plaintiff's Response to Defendant's Proposed Findings of Fact" does not fully comply with the local rules regarding summary judgment. Civil Local Rule 56.2(b) requires that in response to a movant's proposed findings of fact, a non-movant "must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Here, rather than providing citation to the record, plaintiff cites to her own proposed findings of fact. Although Civil L.R. 56.2(b)(2) allows "a party opposing a motion [to] present additional factual propositions," this does not eliminate the requirements of Civil L.R. 56.2(b)(1), even if plaintiff's own proposed findings of fact are supported with citation to the record. Counsel should more fully comply with the local rule in the future.

critical customers of K-C: Wal-Mart, Sam's Club, and Target stores. (Def. PFOF ¶ 7.) During all relevant times to this case, Bill Lindeke served as the Director of Customer Service and had final responsibility and authorization for employment-related decisions in his department. (Def. PFOF ¶¶ 5, 10.) The department was organized such that Customer Logistic Analysts ("CLAs"), such as Kilgas, reported to "team leaders," such as Bill Delrow, the team leader of the Mass Merchandising team. Team leaders reported directly to Lindeke. (Def. PFOF ¶¶ 7, 9.)

K-C considers internal transfers, such as the transfer of Kilgas from marketing to the Mass Merchandising team, either "promotional" moves or "career development" moves. (Def. PFOF ¶ 11.) Promotional moves are accompanied by an actual job promotion, while career development moves provide other career opportunities, but not an actual promotion. (*Id.*) K-C also assigned a value known as a "hay point" to its positions, by which the midpoint salary of each position was set. Kilgas did not receive a promotion or a hay point change when she was transferred to the Mass Merchandising team. (Def. PFOF ¶¶ 16, 17; P. PFOF ¶ 16.)

Almost immediately after her transfer, Kilgas began complaining about the transfer and Delrow began receiving complaints about her performance. (Def. PFOF ¶¶ 24, 25.) During September and October 2004, Delrow met with Kilgas to address these concerns and complaints, and provided her with "coaching" in person and via email to address performance issues. (Def. PFOF ¶¶ 26, 27.) Then, during early November 2004, Holly George, an employee in her late twenties, was transferred to the Mass Merchandising team. (P. PFOF ¶ 22.) At the time George was transferred, she held the position of CLA-2, a higher position than Kilgas. (Def. PFOF ¶ 59.) Based on her past outstanding performance and the technical responsibilities associated with her new position, George's previous team leader, Al Edmunds, recommended that her transfer be

3

regarded a promotional move to a CLA-3 position. (Def. PFOF ¶ 60.) After learning of this, Kilgas met with Delrow and questioned why George had received a promotion in connection with her transfer when Kilgas had not. (Def. PFOF ¶ 62.)

The parties' more specific accounts of this discussion differ. Delrow has testified that Kilgas did not mention age directly or indirectly in the meeting, and that he viewed the meeting as a career development discussion regarding Kilgas. (Def. PFOF ¶ 67.) Kilgas claims she asked Delrow to explain why a younger and less experienced employee received a promotion when Kilgas did not. (Def. PFOF ¶ 66; P. PFOF ¶ 23.) In any event, it is during this meeting that Kilgas claims to have engaged in the protected activity of opposing age discrimination. (Compl. ¶ 8.) Viewing the facts in the light most favorable to Kilgas, as I must, I assume for purposes of the following analysis that Kilgas did engage in protected activity, although the facts regarding the content of the conversation are in dispute. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 261 (1986) ("[A]ll evidence must be construed in the light most favorable to the party opposing summary judgment.") Neither party alleges the specific date the discussion took place.

Kilgas claims that following her discussion with Delrow regarding George's transfer, Delrow retaliated against her by giving her an unwarranted poor performance review, micromanaging her performance, harassing her, and eventually discharging her on April 29, 2005. (Compl. ¶ 9.) On November 15, 2004, after Kilgas returned from a business trip, Delrow met with her to discuss problems her back-up experienced while Kilgas was away. He outlined requirements for her future improved performance. (Def. PFOF ¶ 31.) The parties dispute the cause of the problems, but agree that in a follow-up meeting on November 30, 2004, Delrow expressed concerns with several aspects of Kilgas' performance. (Def. PFOF ¶¶ 35-37.) Delrow informed Kilgas her

4

performance would be more closely monitored in the future. (Def. PFOF ¶ 38.) The two met additional times during December and discussed, among other things, Delrow's continuing concerns about Kilgas' performance. (Def. PFOF ¶¶ 42-45.) Delrow notified Kilgas that failure to demonstrate consistent and significant improvement by January 31, 2005 would result in her removal from the Sam's Club account to which she had been assigned upon joining the Mass Merchandising team. (Def. PFOF ¶¶ 18, 46.)

In January 2005, Delrow formally evaluated Kilgas' performance and, based on her continued performance issues and the feedback Delrow received from Kilgas' co-workers, he ranked Kilgas' overall performance as "Does Not Meet" expectations. (Def. PFOF ¶¶ 50-55.) At the end of that month, Delrow recommended to Lindeke that Kilgas be terminated. Lindeke declined Delrow's recommendation, however, and instead opted to transfer Kilgas to another team in the customer service department. (Def. PFOF ¶¶ 56, 57.) Kilgas remained a CLA-1 and the transfer did not affect her title or pay. (Def. PFOF ¶ 69.) After this transfer off of the Mass Merchandising team, Delrow no longer served as Kilgas' team leader; Todd Marnocha and Al Edmunds were the new team leaders Kilgas worked under. (Def. PFOF ¶ 70.) Over the course of the months of March and April, Marnocha and Edmunds held performance meetings with Kilgas to discuss ongoing problems with her performance, but ultimately noticed little progress and recommended to Lindeke that Kilgas be terminated. (Def. PFOF ¶¶ 75-77.) In April 2005, Lindeke believed it clear that Kilgas' performance was not improving, and consequently, after seeking input from Kilgas' team leaders, he terminated Kilgas' employment on April 29, 2005. (Def. PFOF ¶¶ 78, 79.)

5

On December 5, 2005, Kilgas filed a charge of discrimination with the Wisconsin Department of Workforce Development alleging K-C engaged in age discrimination, a charge which she ultimately amended on April 20, 2006 to include a claim for retaliation. (Def. PFOF ¶¶ 80, 81.) On September 21, 2006, Kilgas commenced this lawsuit, asserting both claims. (Def. PFOF ¶ 83.) Kilgas claims she was terminated because of her age. Kilgas also claims that K-C singled her out and retaliated against her based on her complaint to Delrow that younger workers were treated more favorably.

**DISCUSSION**

**1. Age Discrimination**

Kilgas asserts that K-C's decision to terminate her employment was an act of age discrimination. (Compl. ¶ 14.) A plaintiff may show age discrimination in either of two ways: directly or by the indirect, burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff claims that she has sufficient evidence to allow her age discrimination claim to go forward under the direct method of proof and offers no argument on the indirect method.

The direct method requires a plaintiff to present either direct or circumstantial evidence of discriminatory motivation to create a genuine issue for trial. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (citing *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 940 (7th Cir. 1997)). A plaintiff may rely on two types of evidence to show discrimination through the direct method: (1) evidence that proves discriminatory motivation without reliance on inference or presumption, such as an admission by a decision-maker that he or she intended to discriminate, *Buie*

6

*v. Quad/Graphics, Inc.*, 366 F.3d 496, 502-03 (7th Cir. 2004), or (2) circumstantial evidence amounting to a "convincing mosaic" that suggests intentional discrimination. *See Jordan v. City of Gary, Indiana*, 396 F.3d 825, 832 (7th Cir. 2005) (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Circumstantial evidence may include suspicious timing; statements or behavior from which an inference of discrimination may be drawn; evidence that similarly situated employees outside the protected class received "systematically better treatment;" or evidence that the plaintiff was qualified for the job and replaced by someone younger, coupled with evidence that the employer's stated reasons for the different treatment is a pretext for discrimination. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Plaintiff concedes she has no direct evidence of age discrimination by K-C, but contends that "a jury could find discrimination on the basis of age based on suspicious timing, other bits and pieces of evidence upon which discriminatory intent can be found, evidence that similarly-situated younger employees were treated more favorably, and evidence that the stated reason for the discharge is unworthy of belief." (Br. In Opp. at 10.) She notes that Holly George, a younger employee with less experience in customer relations, was given a raise and promotion upon being transferred to the Mass Merchandising team, whereas she was not. Then, when she complained about it, Kilgas claims Delrow told her to mind her own business and disciplined her for raising the issue. She was thereafter removed from the Sam's Club account and the Mass Merchandising team, and placed in the unique position of being placed on Al Edmonds' team while being supervised by Marnocha, who led a different team. Describing her situation as "being double-teamed by management," Kilgas claims her new supervisors did nothing to help her but "spent their time secretly taking notes to help justify her termination." (Br. In Opp. at 11.) Although she continued

7

to perform her job in the same "thorough and conscientious" manner she had prior to being transferred to Delrow's team, Kilgas claims Edmonds and Marnocha refused to fairly evaluate her work and provide necessary feedback, and instead worked to provide untrue articulated reasons for her discharge. Kilgas argues that this evidence gives rise to an inference of discriminatory animus in connection with her ultimate termination.

In fact, however, Kilgas fails to demonstrate that she has sufficient evidence to create an inference that K-C terminated her because of her age. The fact that George received a promotion upon being transferred to the Mass Merchandising team does not show that Kilgas was discriminated against on account of her age because the two were not similarly situated. It is undisputed that based on her past outstanding performance and the technical responsibilities associated with her new position, George's team leader had recommended that her transfer be a promotional move for her. This means that he suggested that in conjunction with the position transfer George also be promoted from a CLA II to a Customer Logistics Analyst III ("CLA III") position. (Def. PFOF ¶ 60.) Kilkas' team leader, on the other hand, did not recommend her for a promotion (Def. PFOF ¶ 16-17), and her overall performance rating in each of the two years prior to her transfer was "meets expectations." (Ex. 44, 45.) Clearly, the two were not similarly situated. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006). Kilgas does not even attempt to argue that other similarly situated employees were treated differently.

Kilgas' claim that Delrow disciplined her for questioning George's promotion is not supported by the evidence. What the evidence does show is that Delrow instructed Kilgas to cease inquiring into the personal affairs of other members of the team after he received complaints that she was aggressively questioning them about their own employment status and personal career

8

development.  An employer's effort to keep personnel matters confidential does not show discriminatory animus.  Nor does instructing an employee to stop inquiring into such matters constitute discipline.

Kilgas' contention that she was continuing to perform her duties in a "thorough and conscientious manner" has no evidentiary support other than her own say-so.  In fact, her contention that she was performing well is belied by the record and her own testimony.  Kilgas was unhappy with her transfer to Delrow's team, and problems with her handling of the high profile Sam's Club account became apparent almost immediately after she arrived.  For example, in her initial training, Kilgas learned of the team's adherence to the "sundown rule"—a requirement that people working on the account respond to others on the Sam's Club account the same day.  (Ex. A (Dep. of Kathryn Kilgas) at 21.)  Despite Kilgas' admission that she knew of this requirement, shortly after her transfer onto the team, Delrow began receiving complaints from K-C's sales team in Bentonville that she was failing to respond to requests in a timely manner.  (Aff. of William Delrow ¶ 5.)  Based on these complaints and his own observations of inconsistent performance, Delrow began counseling Kilgas regarding various performance issues, either by personal conversation or e-mail, and provided suggestions for improved job performance.  On at least nine separate occasions between September 27, 2004 and October 19, 2004, Delrow provided written performance feedback to Kilgas via e-mail. (Exs. 6, 8, 9, 10, 11, 12, 13, 14, 15, 17.)  For example, Delrow counseled Kilgas multiple times regarding the formatting and accuracy of the Must Arrive By Date Report ("MABD") and about the importance of proper and effective communication; yet, Kilgas admitted that she continued to publish inaccurate reports. (Ex. A. at 54, 96-97, 154, 183-84, 243.)  Additional problems with Kilgas' performance surfaced when she went on a trip to Arkansas in early

9

November 2004. As a result of her failure to process orders herself or leave clear instructions for her back-up, others were left with additional work trying to resolve outstanding orders. (Ex. A at 130-33, 144.) Delrow met and counseled Kilgas concerning this matter as well. (Exs. 26, 27.)

When, despite his informal efforts, Kilgas' performance did not improve, Delrow directed Kilgas to develop a performance action plan on December 23, 2004. (Ex. A at 198.) The performance action plan required Kilgas to improve her communications, integrity, thoroughness, decision making, flexibility and personal sensitivity. (Ex. 32-33.) Shortly thereafter, Delrow set about to complete Kilgas' annual evaluation. Because he had not been her supervisor for the full year, Delrow asked Kilgas to provide the names of individuals with whom she had worked over the last year so he could solicit their views concerning her performance. Kilgas provided several names, and Delrow contacted them, including her former team leader. Based on the information he obtained and his own observations, Delrow completed her evaluation and ranked her overall performance as "Does Not Meet" expectations. (Def. PFOF ¶¶ 51-55.) Based on her lack of improvement, Delrow recommended to Lindeke that Kilgas be terminated.

Against this evidence, Kilgas offers only her contention that her previous five years of evaluation showed her meeting or exceeding expectations when she worked on other accounts. But in fact, while it is true that in some areas she exceeded expectations, her overall rating for 2001, 2003, and 2004 was only that she met expectations. (Ex. 44-46.) And the fact that by her own admission she did not want the transfer, was handling a different account under the supervision of a different team leader, and failed to accurately perform her work are obvious non-discriminatory explanations for the lower evaluation. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors,

10

are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.").

Of course, it was not on the basis of Delrow's recommendation alone that Lindeke decided to terminate Kilgas' employment. He first transferred her to another team where she was supervised by Edmonds and Marnocha. He also had her prepare a new action plan outlining steps she would take to improve her performance. (Def. PFOF ¶¶ 68-72.) According to Lindeke, Kilgas failed to complete many of the items on her plan, such as going to classes and using external resources to improve her skills. In addition, Edmonds and Marnocha continued to observe significant problems with her performance which they addressed with her during several performance meetings in March and April of 2005. These included such problems as data entry errors, engaging in personal business while at work and at her desk, and unavailability. (Def. PFOF ¶¶ 74-76; Ex. 41.) Finally, based on the recommendation of Edmonds and Marnocha, as well as Delrow, Lindeke decided to terminate Kilgas and did so on April 29, 2005, for poor performance. (Def. PFOF ¶¶ 78-79.)

In response to this evidence, Kilgas again offers her previous evaluations and her own opinion, based on the "positive feedback" she received from unnamed customers and co-workers, that she was doing a good job on the accounts. But as already noted, her previous overall performance ratings simply showed she met expectations. Even if accurate, they hardly demonstrate the level of her performance the last year. And her own opinion as to her performance, even if based on "positive feedback," is insufficient to overcome the evaluations of three supervisors, all of whom found and documented significant deficiencies. "Positive feedback" from unnamed sources is not admissible evidence and thus cannot be considered in deciding a motion for summary judgment. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996) ("a party

11

may not rely upon inadmissible hearsay . . . to oppose a motion for summary judgment."); *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 912 (7th Cir. 2002) ( "A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture."). And a Title VII plaintiff's self-serving opinion that she was performing well is not enough to show that the non-discriminatory reason cited by the employer was a pretext. *Keri v. Bd. of Trustees of Purdue University*, 458 F.3d 620, 628 (7th Cir. 2006) ("Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment."). Moreover, even if Kilgas' overall performance had not been objectionable, it would not mean the reasons given for her termination were pretextual. "Unless he attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision, which we have consistently refused to review." *Anderson v. Stauffer Chemical Co.,* 965 F.2d 397, 403 (7th Cir. 1992). Any other approach would transform the court or a jury into a personnel department, a role which the courts have consistently declined. *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422 (7th Cir. 1992) ("Neither the jury nor this Court is empowered to act as a 'super-personnel department' and decide if [a] firing was unwise or unjustified.").

Finally, Kilgas' assertion that Edmonds and Marnocha conspired to manufacture grounds to terminate her after Linbecke elected not to terminate her on Delrow's recommendation also finds no support in the evidence. Although Kelgas asserts that it was unusual for an employee to be supervised by two different team leaders at the same time, she offers no admissible evidence to support her claim. And the suggestion that Edmonds, Marnocha, Delrow, and Lindeke all conspired together to fabricate reasons to terminate her is sheer speculation. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) ("We have typically been wary of allegations

12

based on nothing but an attempt to come up with a conspiracy theory and in particular where there is not a scintilla of evidence in the record before us to support Wells's theory."). More importantly, this contention is inconsistent with her own testimony. Kilgas admitted under oath that she did not believe Edmonds or Marnocha discriminated against her. (Ex. A at 14-15.) She cannot avoid the effect of this admission by arguing otherwise in opposing summary judgment. *Ineichen v. Ameritech,* 410 F.3d 956, 962-63 (7th Cir. 2005).

In sum, I conclude that Kilgas has failed to demonstrate she would be able to present evidence from which a jury could infer she was terminated on account of her age. Accordingly, summary judgment will be granted on that claim, and I turn to her retaliation claim.

**2. Retaliation**

Kilgas claims that K-C retaliated against her after she expressed her opposition to what she perceived as age discrimination. She claims that in retaliation for her objection to the fact that George, a younger, less experienced employee, was given a promotion upon her transfer to the Mass Merchandising team and she was not, she was subjected to conditions and treatment that amounted to a hostile work environment, and finally terminated from her position.[2] A claim of retaliation, like employment discrimination in general, can be established using either the "direct"

---

[2] K-C argues that because Kilgas did not explicitly refer to a hostile work environment in her original charge, the claim is untimely and barred for failure to exhaust administrative remedies. (Def. Reply Mot. Summ. J. 3-4.) However, Kilgas is not asserting a separate hostile workplace claim; instead she is simply claiming that K-C's retaliation against her for speaking out against age discrimination took the form of creating conditions that were hostile to her and ultimately led to her termination. With this understanding, I conclude she is not asserting a separate claim. Nor is her claim time-barred. Each of Kilgas' claims are based on her termination which she claims was both on account of her age and because she had complained about discrimination. The evidence of earlier events is offered merely to demonstrate the animus she claims motivated K-C in terminating her. An employee may present "prior [and otherwise untimely] acts as background evidence in support of a timely claim." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

13

or "indirect" method. To proceed under the direct method, a plaintiff must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Culver v. Gorman & Company*, 416 F.3d 540, 545 (7th Cir. 2005). The indirect method utilizes a modification of the *McDonnell Douglas* factors and does not require a showing of causation. Under the indirect method, a plaintiff must show she (1) engaged in statutorily protected activity, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Kilgas seeks to meet her burden under both the direct and indirect methods.

### a. Direct Method

In support of her argument under the direct method, Kilgas erroneously relies on the Seventh Circuit's decision in *Culver v. Groman & Company*. Kilgas asks the court to infer that her protected activity was the true cause of her termination from evidence that she received unfavorable reviews after engaging in the activity. She cites *Culver* as support for the proposition that "an employer's sudden dissatisfaction with an employee'[s] performance after that employee has engaged in a protected activity can constitute circumstantial evidence of causation." (P. Br. Opp. Mot. Summ. J. 15.) This statement is best understood within the context of that case. In *Culver*, the Seventh Circuit considered three pieces of circumstantial evidence sufficient to support an inference of causation for purposes of a prima facie case of employment discrimination: (1) the suspicious timing of plaintiff's termination only 72 hours after she engaged in protected activity, (2) defendant's sudden and "radical" reversal of its evaluation of plaintiff's performance, and (3)

14

defendant's prior warning to plaintiff that having the meeting in which plaintiff engaged in protected activity would be "a mistake." 416 F.3d at 546-47.

Unlike *Culver,* Kilgas fails to offer evidence that the timing of her termination was suspicious. In *Culver*, the court stated that the "short 72-hour period" between the plaintiff's protected activity and her termination was "of major significance." *Id.* at 546. In the present case, however, Kilgas claims she first complained about the promotion given to the younger George in early November, 2004. Yet, she wasn't terminated until six months later. More importantly, the record clearly shows that Delrow expressed concern about Kilgas' performance before she complained about George's more favorable treatment. Kilgas admits that "prior to complaining of disparate treatment because of age, Kilgas was being coached through mistakes and given suggestions regarding how to improve . . . .". (Br. In Opp. at 6.) Under these circumstances, the timing of her termination in relation to the allegedly protected conduct is not so suspicious as to give rise to an inference of retaliation.

The timing of the termination in *Culver* and the instant case is also very different with respect to the length of time between the terminations and the last favorable performance evaluations the plaintiffs received. In *Culver*, termination "followed closely on the heels of [plaintiff's] annual performance evaluation." 416 F.3d at 546. The evaluation reported that plaintiff "met or exceeded all expectations," and was conducted by the same supervisor who terminated plaintiff's employment a short time later. *Id.* Indeed it would be logical to question whether an employer acted in good faith after presenting an inconsistent message by expressing approval of an employee's work, then suddenly expressing drastic disapproval. However, Kilgas provides no evidence that K-C ever presented her with such an inconsistent message. Kilgas' last evaluation

15

was issued by Delrow and indicated she did not meet K-C's expectations. (Def. PFOF ¶¶ 50-55.) Lindeke's decision to terminate Kilgas three months after this performance review could hardly be called sudden or inconsistent with the feedback she had previously received. It also reflected the separate opinion of a different supervisor than the one who issued Kilgas' performance evaluation.

Notably, the *Culver* Court also considered the communication between the defendant and plaintiff that plaintiff took to be a warning against protected activity before concluding that an inference of causation was reasonable. In *Culver*, the person who ultimately fired plaintiff warned her not to have the meeting in which plaintiff engaged in protective activity, telling her that to express her concerns in the meeting would be "a mistake." 416 F.3d at 547. While Kilgas also alleges that Delrow reprimanded her by telling her not to place team members in an awkward position by inquiring into their personal employment situation, I have already considered and rejected her contention that Delrow's instruction was improper and demonstrates discriminatory animus.

Finally, Kilgas notes that causation is typically satisfied when in addition to following closely on the heals of the protected expression, the plaintiff shows that the person who decided to impose the adverse action knew of the protected conduct. (Br. In Opp. at 5 (citing *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). But here, Lindeke testified that he did not know of any complaints Kilgas made about being treated less favorably than younger employees at the time he terminated her employment, and Kilgas has presented no evidence to the contrary. (Lindeke Dep. 55:18-25, June 12, 2007.) For an employment decision to be deemed retaliatory, the decisionmaker, logically, must have had actual knowledge of the protected conduct. *Tomanovich*, 457 F.3d at 668.

16

### b. Indirect Method

Any claim of retaliation under the indirect method would require a showing that Kilgas was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* at 663. Kilgas has again failed to identify any similarly situated employee who was treated more favorably than herself. The employee most similarly situated to Kilgas was Young, who is actually older than Kilgas, though for purposes of the retaliation claim her age is not relevant. Young, like Kilgas, was assigned to the Sam's Club account and placed on a performance improvement plan by Delrow when she had difficulties performing her job. Also like Kilgas, Young was transferred off the Sam's Club account after failing to improve. (P. Br. Opp. Sum. J. 8, 17-18.) Kilgas asserts that after being transferred to another account, Young did not have to report to two separate team leaders or undergo constant scrutiny. (Id. at 8.)

This argument fails, however, for two reasons. First, Kilgas has offered no admissible evidence to support her contention that Young was not subjected to the same scrutiny she was when removed from the Mass Merchandising team. By her own admission, she has no personal knowledge of what steps were taken to insure that Young's performance improved after she was removed from the Sam's Club account. ("The only thing I do know in relationship to Cheryl Young's performance on the job was . . . that she was not doing a good job." (Ex. A. 151.)). Thus, Kilgas has failed to demonstrate Young was not subjected to supervision by multiple team leaders. But regardless of the level of supervision, the evidence is undisputed that Young flourished after her transfer, whereas, as noted above, Kilgas continued to have problems in her performance. Thus, the two are not comparable, and Kilgas is unable to establish a prima facie case under the indirect method as well.

17

## CONCLUSION

I conclude that Kilgas cannot establish a prima facie case of a age discrimination or retaliation. K-C's motion for summary judgment is therefore granted and this action is ordered dismissed. Judgment shall be entered accordingly.

**SO ORDERED** this ⎯⎯12th⎯⎯ day of October, 2007.

                                                 s/ William C. Griesbach
                                                 William C. Griesbach
                                                 U.S. District Judge